Good morning, Your Honors. My name is Vicki Buchanan. I'm representing John Jeffers, the appellant in this matter. I would like to reserve three minutes for rebuttal. When the district court ruled on this matter, on the withdrawal of Mr. Jeffers' plea motion, it stated it was to follow the guidance and instructions of the court and the defendant as a paramount object of this Court's inquiry. The statement made by the court in the context of a pre-sentencing withdrawal proceeding was wrong, according to this Court's holdings in the case of Ortega, Escancio, Garcia, and Davis. The standard to be applied in those cases is fair and just, a fair and just reason, which is liberally applied and which is a generous standard. A reason for withdrawing a pleading a plea that is fair and just is a reason that did not exist at the time of the plea. At the time Mr. Jeffers entered into his plea with the government, he had been, his bail, he had been rearrested and his bail was subject to being revoked. A few days later, he entered into his plea agreement, and as part of that plea agreement, he believed that he was going to be saving the properties that were used as collateral for his bail. Was that mentioned one way or the other in the plea agreement? In the plea agreement? No, it was not. It was not part of the plea agreement. This was a misunderstanding of Mr. Jeffers and his attorney, Mr. Scott. Don't we apply standard contract law to the interpretation of plea agreements? I don't believe that this, that we have to interpret a plea agreement because we're in the, we're not at that point where we're looking for, for. I mean, the essence of what you're arguing is that something was promised your client that was not delivered, but the promise was contained in the plea agreement. And there's no mention of this in the plea agreement. This is to withdraw a plea. Am I wrong about either of those things? Yes, because this is not, this is a mistake of fact. It's similar to the mistake that were made in Davis or other cases. That was not part of the plea agreement either. I'm out for just a second. I thought I heard you argue to the panel that the reason your client wanted to withdraw his plea is because he believed that by entering into the plea, the sureties would be protected. Is that right? That's correct. But he did, he did not have it as part of the plea. It was a misunderstanding he had that the fact of entering into the plea, that just the entering in the plea and pleading guilty and saving the government its time. What is it that led him to that belief? I don't, I really don't know. He's, he, his attorney. Anything in the plea agreement itself? No, there was nothing in the plea agreement. Was it anything the prosecutor said to him? There was, his attorney, when talking to the judge on October 4th, said that he did understand that Mr. Jeffers was under the mistaken impression that he, if he entered into the plea agreement, that the collateral would be spared. And the only other issue was when there was a discussion during the plea colloquy in which the judge mentioned that, asked the U.S. attorney, you know, are you going to seek forfeiture of the properties? Mr. Jeffers at that point in time thought they were referring to the collateral properties. Instead, they were actually referring to the properties that, any properties Mr. Jeffers might have obtained through his conduct. And at that point in time, the U.S. attorney said, no, we don't have any, any idea of doing it at this particular time. So it was a misunderstanding of Mr. Jeffers. But it's a fair and just and generous standard. He truly believed that because of, by doing this, he would be able to get out of his plea agreement. And the timing. But his lawyer stated flat out on the record that he had, that Mr. Jeffers had this misconception. Well, it was on the record. It was not in the hearing itself. But, yes, his attorney stated to the district court judge that Mr. Jeffers had this misconception, that he had a misunderstanding. That was his second attorney, but the attorney that had represented him during the plea. The only time there was an on-the-record mention of this understanding or misunderstanding? No. During the withdrawal motion, it was discussed extensively. Prior to the withdrawal motion? Prior to the withdrawal motion, there were probably discussions between the attorneys, but no, the attorney and client, but no, there was nothing. I mean, on the record in front of the court? Only that one. But the timing is very close to when the government actually did seek the forfeiture of the properties. So the only time this issue was raised, it was by your client's former counsel, then the counsel of record, informing the court that your client had this impression, but that it was a mistaken impression. Is that correct? That's correct. But then it was brought before the district court in conjunction with the withdrawal motion. It was discussed extensively. But it was not mentioned in the withdrawal motion, was it?  It was not in the paperwork. It was addressed at the hearing. I couldn't find — I did find in the Rubalcaba case, which was cited by the court, that it said, do you waive an issue if it's not presented in the papers or at the hearing? That's probably dipped up, but I couldn't find anything. But it was raised, and it was raised specifically and mentioned several times during that hearing, and it was also discussed at the end of the hearing by the attorney. He said that that was one of the reasons that Mr. Jeffers wanted to withdraw the plea. So at the time that he entered into the plea, he believed that he was saving the properties. As of the time — He mistakenly. He mistakenly believed that he was saving the properties, the collateral properties. And then as soon as he found out that the government was going after the properties, that's when he made his timely motion. This is not one of those cases — As of the time of the hearing, he knew the government was not going to forfeit the property. Well, at the time of the hearing, the government lost their motion. They had already lost their motion. That was — that went on the same day that Mr. Jeffers informed the court that he wanted to withdraw his plea. And at that hearing, the court said, no, I'm not going to take the property. Well, he decided to withdraw his plea after he read the PSR. Well, certainly the timing was after the PSR, but that wasn't the basis, because if you look at the PSR, it is absolutely consistent with the plea agreement. The only difference between the PSR and the plea agreement was the two points for reduction for acceptance of responsibility, which was still in the hands of the judge at that point in time. So he would have been at 32 instead of 34. So that was not the cause that generated this. What caused it was in September 7th, the government filed for the forfeiture of the collateral properties. So that was — that was the event that occurred after that. And then — Wait, wait. The government filed for the forfeiture of what? The collateral properties. Mr. Jeffers put in $500,000. Friends, family, church members put up $500,000 of their homes for — to back the bail bond for Mr. Jeffers. And when he was rearrested for allegedly violating the bail bond, then the government had the right to seek forfeiture of their properties, their homes. And so that's — they filed for that then on September 7th after the — you know, it happened to be after the PSR, which came out in August. And it was — So they filed September 7th, and when was it denied? Pardon? When was the government's motion denied? On October 4th. That was the same day that Mr. Jeffers informed the court he wanted to withdraw his plea. Therefore, based on the foregoing, I think that if the court had applied the appropriate standard, instead of thinking it was only to look at the plea colloquy and to see if this was voluntary and knowingly, that there might be a different result in Mr. Jeffers' — And he asked to withdraw his plea before or after the government stated that it was not going to go after the collateral property. He asked for it after when they actually did go after the collateral properties. So he — On the same day that the judge ruled that they were unable to — that he would not let them get the property. Yes, but that was — he told the judge he wanted to withdraw it, and then the court went and heard the motion after that, and the court did deny the forfeiture of the properties. But that doesn't — you know, that doesn't make any — if Mr. Jeffers had known that the properties were not going to be taken at the time of his plea and that had never happened, then he would not have been trying to withdraw his plea. Well, if that was the primary reason that he was seeking to withdraw the plea, how do you explain the fact that it's not mentioned in his motion? I can't explain that, except I don't know that any of the attorneys ever really listened to Mr. Jeffers. I mean, that was one of his problems, that they never — he had several attorneys throughout that never really listened to him when he went in for his plea agreement. And I see these all the time where people say, well, my lawyer wasn't prepared, so they pushed me into a plea agreement. But this is an incredibly complex case, very difficult to understand. I can't figure out what the whole scheme was that was behind this case. But at the time of the plea hearing, Mr. Jeffers' attorney had done almost nothing. This is a complex case that — He did take $40 million of his parishioners' money. Well, that's what is alleged. I mean, we don't know. Mr. Jeffers hasn't had an opportunity to actually go before the court. Because he continues to maintain his innocence, he got four extra years in prison, because the court determined that that was a — was not accepting responsibility. So I don't know what this is. I don't know if it's really a scheme or what it is. I don't know if he was duped by someone. Is he a practicing minister? He's an ordained minister. I don't believe he's practicing. I think he — and maybe Mr. Matz is more familiar with that than I am. But he — no, he had — but he had a Christian following, a lot of people that knew him as a holy — as a spiritual man. And I do believe that, you know, he — I can't tell what this was from — and you talked about his parishioners. Did he have a church, a parish? I mean, or was he just a businessman who happened at some point to have gotten ordained? From the record, I can't establish what that was. But I believe that he had a church connection where maybe he did preach at a church in Redlands area. Okay. All right, well, you're a little over your time, so we'll give you a minute. All right, thank you. Thanks. Good morning. May it please the Court, my name is Jeremy Matz. I represent the United States on this appeal. Your Honors, the record, I believe, could not be more clear that the impact on the Surety's Homes was not any part of the reason why defendant pled guilty in the first place in July of 2004, and it was also not any part of the reason why defendant moved to withdraw his plea later in November of 2004. And in any event, the fear dissipated. I'm sorry, Your Honor? The fear dissipated. That is correct, Your Honor. And it is a matter of timing, which is very important that the Court has properly focused on this morning. As to your first point, how could the record show what was in his mind? The record can't make it clear as to what his motive is. Your Honor, I think actually in this case, unlike in perhaps most other cases, the record does actually reflect exactly what was in this defendant's mind, both immediately before, during, and immediately after the time that he entered his guilty pleas. And the reason for that, of course, is because of his phone calls to his wife and to his secretary, all of which are part of the record. As the Court knows, in those phone calls, the defendant discusses many reasons why it is in his interest to plead guilty, not once in any of those conversations, which, of course, are occurring with two of his closest people in the world, is there any mention whatsoever of him pleading guilty in order to try to save or somehow preserve the homes that belong to the Surety's. There is ample discussion of all of the other reasons why he is, in fact, pleading guilty. So in this particular case, the record does actually indicate what was in Mr. Jeffers' mind. And there were many things in his mind, to be sure, but the impact on the Surety's homes was certainly not in July of 2004, in October of 2004, and even November of 2004 when he moved to withdraw the pleas. Certainly the district court could have made that kind of a determination and said this is not the reason. As I read the record of the hearing, did the district judge ever deal with the question of whether that was a reason? Not explicitly, Your Honor, because of the fact that the district judge was never called upon to do so because of the fact that the impact on the Surety's homes was never actually put forward by Mr. Jeffers as a ground to withdraw his pleas. It wasn't in the papers, but in the — there was a lot of discussion about it in the hearing itself. Your Honor, there was some discussion by Mr. Jeffers on direct examination at the hearing to withdraw the plea about his purported reasons to withdraw the plea. And he did say on direct examination that at the time he pled guilty, he was allegedly thinking about the Surety's homes. However, he completely backed away from that position on cross-examination, as the Court knows from the record. And on cross-examination, he candidly admitted that the reason he wanted to withdraw his pleas at that point in time was because he wanted to go to trial, because he was innocent, and because he wanted to win. That's the reason why he said he wanted to withdraw the pleas before the district judge on the hearing at the motion. None of those reasons, of course, have anything to do with the Surety's homes. And so I think that to the extent the district judge may have been wondering whether the Surety's homes were any part of the reason to withdraw the plea, even though they were not put forward as such, the district judge clearly could have reached no other conclusion but that the Surety's homes formed no part of the reason to withdraw the plea, based on Mr. Jeffers' own admissions. He said at the hearing, I want to go to trial because I'm innocent and I'm going to win. Well, it refreshes my memory. How did the government get a hold of the conversations that the defendant had with his wife and his secretary? The government obtained those conversations because they were recorded at the county jail where Mr. Jeffers was then incarcerated, pending designation by the Bureau of Prisons, obviously after he was sentenced. And every single inmate at that particular county jail in San Bernardino is advised at the beginning of every single phone call that the phone call is being recorded, that there is no privacy interest in the phone call, and that the authorities at the institution may be listening in on those phone calls. I know that because I myself listen to those phone calls. And I believe that's part of the record. I know that's part of the record because the government advised the district judge that those advisements were made on the phone calls, and the district judge was aware of that fact. Did you say you listened to the phone calls? I'm sorry, Your Honor? You listened to those phone calls? I've listened to the ones that are part of the record, yes, the ones that were . . . Tapes? Yes, of course, not live, of course. I've listened to recordings of those phone calls, yes. And so as I was saying, the factual record could not be more clear that the defendant was not thinking about the surety's homes at the time he pled guilty, nor was he thinking about the surety's homes at the time he moved to withdraw his plea. The only time that he . . . I should say the first time that he ever raised to the district judge, as Your Honor has indicated, his alleged concern with the surety's homes was on October 4th of 2004. That was three months after he pled guilty. That was six weeks after the pre-sentence report was disclosed. That was the same day that the district judge, after hearing from Mr. Jeffers in Chambers, then proceeded to rule on the motion, the government's motion, to forfeit the bond. And, of course, the district judge denied that motion. And so Mr. Jeffers walked out of court that day on October 4th. He was present during the entire proceeding, knowing that the surety's had regained title to their homes, knowing that the government had not prevailed on its motion to forfeit those homes, and knowing that the surety's were safe in holding title to their homes. About more than four weeks later, I believe it was on November 8th of 2004, is when he actually made his motion to the district court to withdraw his plea. And so there is no possible way that four weeks after he himself heard that the surety's had regained title to their homes, that he could then be making a motion to withdraw his plea, supposedly on the ground, to restore title to those homes to the surety's. Roberts. Okay. Thank you, Your Honor. We would ask that the Court affirm Mr. Jeffers' convictions. Thank you. All right. Very quickly on the issue about whether or not the, you know, the fear had dissipated. The only analogy I can come up with is if I enter into a contract for a covenant not to sue, and I get sued, but I still win the lawsuit, have I been harmed or not harmed? It's the same sort of thing. Just because the surety's properties were not taken away, at the time Mr. Jeffers had his concern and things had changed was when he learned that they were seeking to take the properties away. As far as the phone calls, we don't know how many conversations Mr. Jeffers had with his wife leading up to after his bail was revoked. She said in the record that she visited, I mean, there was testimony in the record that she visited with him three times a week. Those conversations inside the courthouse are not recorded. So what he says after a hearing may have no effect at all. In fact, the point is the judge should have been the one deciding that. Mr. Jeffers, when he was cross-examined by Mr. Matz, did say, you know, after Mr. Matz walked him down a line of reasoning, said, so you have no harm because the properties weren't taken away. And Mr. Jeffers said, well, I have. I have other harm, too. But that's a legal sort of conclusion and argument. And the matter was discussed subsequently, and his lawyer did bring it up in closing statements. Thank you very much. Thank you very much. The matter will stand submitted. And we'll.
judges: Pregerson, Reinhardt, Hawkins